**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TERRY JEROME BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 13 C 2775 |
| | ) | |
| **DR. PARTHASARATHI GHOSH, DR. IMHOTEP** | ) | **Judge Rebecca R. Pallmeyer** |
| **CARTER, DR. SALEH OBAISI, C/O SHAWNNEL** | ) | |
| **GRUBBS, C/O CHRISTOPHER MEDIN,** | ) | |
| **MARCUS HARDY, WARDEN RANDY PFISTER,**[1] | ) | |
| **ROYCE BROWN REED, MADONA MAIKAITIS,** | ) | |
| **NURSE TIFFANY UTKE, NURSE CYNTHIA** | ) | |
| **GARCIA, NURSE ALETHA HARPER and** | ) | |
| **NURSE WENDY DYBAS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Terry Brown is incarcerated at Stateville Correctional Center.  In this lawsuit, Brown alleges that employees of the Illinois Department of Corrections ("IDOC") and IDOC's medical services provider, Wexford Health Sources, Inc. ("Wexford"), acted with deliberate indifference toward his medical conditions and retaliated against him for filing suit, in violation of 42 U.S.C. § 1983.

Brown suffers from a serious spinal condition called spinal stenosis.  He alleges that Defendants displayed deliberate indifference to this condition by (a) wrongfully confiscating his neck brace, losing it, and failing to provide a new one for six months; (b) failing to arrange for him to attend a necessary follow-up appointment for eight months after a difficult surgery; and (c) ignoring treatment instructions from his surgeon.  Brown also suffers from glaucoma, and claims that certain prison and medical staff forced him to keep necessary medication in his cell, thereby rendering it subject to confiscation.  Finally, he claims that the prison's doctor refused to renew the permit for his crutch in retaliation for filing this suit.

---

[1]     During the pendency of this case, Randy Pfister replaced Marcus Hardy as Petitioner's custodian at the Lawrence Correctional Center.  *See* FED. R. CIV. P. 25(d)(1). Pfister has been added as a party defendant because Plaintiff seeks injunctive relief.

Brown sued numerous IDOC staff and Wexford staff, and some have been dismissed from the suit. The remaining defendants, Shawnel[2] Grubbs, Royce Brown-Reed, and Marcus Hardy (the "IDOC Defendants"), and Nurses Madonna Maikaitis, Wendy Dybas, Aletha Harper, Tiffany Utke, and Cynthia Garcia, along with Doctors Imhotep Carter and Saleh Obaisi (the "Wexford Defendants") have moved for summary judgment.

## BACKGROUND

Brown has been an inmate at the Stateville Correctional Center since October 1, 2009. (Pl.'s Additional Statement of Facts in Resp. to IDOC Statement of Facts [hereinafter "Pl.'s SOF to IDOC] [168-1], at ¶ 47.) He claims that prison staff have been deliberately indifferent to his medical conditions in a variety of ways during his imprisonment at Stateville, as described below. The court views the record in the light most favorable to the party opposing a motion for summary judgment, here, Brown. *Dawson v. Brown*, 803 F.3d 829, 832 (7th Cir. 2015).

## I.     Issues Related to Brown's Spine

Brown has suffered from spinal stenosis, a degenerative joint disease, since prior to arriving at Stateville in October 2009. (Pl.'s SOF to IDOC ¶¶ 51, 61.) Brown utilized a neck brace and cane for his condition upon entering the facility (*id.* at ¶ 47), and continued to wear the brace whenever he left his cell (except to shower) (*id.* at ¶¶ 49), until it was taken from him in late October 2011. (*Id.* at ¶ 54; Pl.'s Resp. to IDOC Defs.' Rule 56.1 Statement [hereinafter Pl.'s Resp. to IDOC SOF] [168-1], at ¶¶ 31–34.)

Stateville regulations require inmates to possess a permit for any medical equipment they have. (IDOC Defs.' Local Rule 56.1 Filing [hereinafter IDOC SOF] [155], at ¶ 26.) If an inmate possesses a piece of medical equipment without a valid medical permit, it is considered contraband and subject to confiscation. (*Id.*) Brown was issued a medical permit for his neck

---

[2]     The complaint states that Mr. Grubbs' first name is spelled "Shawnnel," however, his counsel refers to him as "Shawnel," as does his deposition. The court assumes that the latter spelling is correct.

brace when he entered the facility.  (Pl.'s SOF to IDOC ¶ 48.)  Dr. Parthasarathi Ghosh, the

medical director at Stateville from 2003 to March 2011 (Dep. of Dr. Parthasarathi Ghosh, Ex. C

to Wexford Defs.' Local Rule 56.1(3) Statement of Facts [hereinafter "Ghosh Dep."] [150-3], at

13:19–14:2), renewed the permit on in July 2010 (Pl.'s SOF to IDOC ¶ 52), and November

2010, after which it was set to expire on June 30, 2011.  (*Id.* at ¶ 53.)

There is a dispute about the status of Brown's permit after these dates.  Brown asserts

that a doctor at Stateville ordered the permit renewed for another six months after a medical

appointment on June 17, 2011 (Pl.'s Resp. to IDOC SOF ¶ 36(a)), and there are medical notes

that either reflect a staff member reviewing the permits or ordering them renewed.  (Ex. 10 to

Pl.'s Resp. to IDOC SOF [168-11]).[3]  The identity of the person who wrote the notes is

uncertain, made more complicated by the fact that Dr. Ghosh left his position as medical

director in March 2011 (Ghosh Dep 13:23–24), and Dr. Imhotep Carter, the medical director that

succeeded him, did not assume the job until July 25, 2011.  (Wexford Defs.' Local Rule 56.1(3)

Statement of Facts [hereinafter Wexford SOF] [150], at ¶ 14.)  Regardless, Brown apparently

did not receive the permit, as he informed a nurse at a medical appointment on August 28, 2011

that he still needed it.  (Pl.'s Resp. to IDOC SOF ¶ 36(c); IDOC, Offender Outpatient Progress

Notes (Aug. 10, 2011), Ex. 11 to Pl.'s Resp. to IDOC SOF [168-12] (noting "I need my permits

renewed").)  He still had not received the renewed permit on October 27, 2011 when he filed a

grievance about the matter.  (Pl.'s Resp. to IDOC SOF ¶ 36(b); Offender's Grievance #4070

(Oct. 27, 2011), Ex. 6 to Pl.'s Resp. to IDOC SOF [168-7].)

IDOC asserts that Brown was well aware that his permit had expired, was not renewed,

and was not valid after June 30, 2011, citing portions of Brown's deposition in which he admits

that he "did not have an up-to-date permit," and admits that the permit he possessed earlier had

---

[3]        These notes are very vague.  The following appears in the "Plans" column of the
notes: "Permits: Low bunk, low gallery, crutch, [illegible] front [illegible] brace x 6 mos."  (Ex. 10
to Pl.'s Resp. to IDOC SOF [168-11].)  A check mark appears after each type of permit.

expired.  (Dep. of Terry Brown, Ex. B to Wexford SOF [hereinafter Pl.'s Dep.] [150-2], at 84:6–12; 218:8–21.)  Brown contends that although he had not yet received a physical copy of the renewed permit, it was "renewed," in the sense that the medical staff had ordered the permit renewed on June 17.  (Pl.'s Resp. to IDOC SOF ¶ 36.)

Either way, it is undisputed that Brown was wearing his neck brace on October 28, 2011 without possessing a valid, physical permit for it.  (IDOC SOF ¶¶ 31–34.)  Correctional Officer Shawnel Grubbs pulled Brown out of a line of prisoners on the way to the cafeteria for a random shakedown.  (*Id.* at ¶ 31.)  Grubbs recalls that he observed Brown without a permit.  (Dep. of Shawnel Grubbs, Ex. F. to IDOC SOF [hereinafter "Grubbs Dep.] [155-5], at 47:13.)  From his testimony, it appears that Grubbs either confiscated the neck brace on the spot (*id.* at 49:12–14 ("I bagged it and tagged it . . . it was turned into personal property.")), or took Brown to segregation where the guards in the segregation unit seized the brace.  (*Id.* at 53:18–19 ("The neck brace was taken upon arrival to seg. He didn't give it to me.").)  Brown asserts that Grubbs could have done any number of things instead of taking his neck brace, or causing it to be taken in segregation, such as following up with the healthcare unit to determine the validity of the permit, but Grubbs did not.  (Pl.'s SOF to IDOC ¶ 54.)  Grubbs agreed that he could have "jump[ed] through the hoops to do [Brown] a favor of keeping the brace."  (Grubbs Dep. 52:20–24.)  Presumably, Grubbs was referring to calling the healthcare unit to determine whether Brown had a valid permit which, according to Grubbs, could take between ten minutes and two hours.  (*Id.* at 38:18–39:2.)  Grubbs also testified that most of the time he gave inmates a "pass" if they did not have a valid medical permit on them, provided their "demeanor and attitude [were] correct" (*id.* at 39:14–17), or he would follow up at the inmate's cell to determine whether he had a valid medical permit.  (*Id.* at 39:22–40:6.)

It is undisputed that Brown was deprived of his neck brace for months.  The neck brace taken from him during the October 28, 2011 incident was never returned (Pl.'s SOF to IDOC

4

¶ 56), and he did not get a new brace until May 30, 2012. (*Id.* at ¶ 63.) The Defendants contend that the neck brace was not, in fact, medically necessary. (IDOC Mem. in Support of Mot. for Summ. J [hereinafter IDOC Br.] [154], at 6 (arguing that "Plaintiff cannot demonstrate that he was harmed as a result of the conduct of Grubbs"); Wexford Defs.' Mem. in Supp. of Summ. J. [hereinafter Wexford Br.] [149], at 6 (Brown's "request for the various permits should be denied as they are not medically necessary and would not cure any of his current ailments.").)

In his briefs, Brown contends that the brace was in fact "vital and necessary" (Pl.'s Opp'n to IDOC Defs.' Mot. for Summ. J. [hereinafter Pl.'s Br. Opp. to IDOC] [168], at 9; Pl.'s Opp'n to Wexford Defs.' Mot. for Summ. J. [hereinafter Pl.'s Br. Opp. to Wexford] [169], at 11), and that as a result of losing the brace "[h]e was in constant pain for months," and "[h]e was worried about whether a fall or even a jostle could cause catastrophic and permanent damage to his neck." (Pl.'s Br. Opp. to IDOC 12; *see also* Pl.'s Br. Opp. to Wexford 11.) Brown has maintained all along that the purpose of the brace was to stabilize his neck to prevent unnecessary painful movement and to protect him in the event of a fall or other external injury. In one grievance, filed October 27, 2011, he stated that he was in pain and that he was at risk of internal injuries because he did not have the brace. (*See* Offender's Grievance #4070.) In his deposition, he testified that he currently wears the neck brace when he is in pain so that his neck will not move if he falls. (Pl.'s Dep. 249:17–23.) He further states that having the brace confiscated "would cause me a pain and suffering with my spine." (*Id.* at 264:17–18.) In a grievance filed before he got the brace back on May 2, 2012 (Offender's Grievance #K-76895 (May 2, 2012), Ex. E to 3d Am. Compl. [112-5]), Brown complains that "I am [in] much pain and the neck brace will [illegible] me [] from Moving my Neck so much which go to my Spine that causes [illegible] lot pain . . . ." (*Id.*) Finally, Brown reported to medical staff at the University of Illinois at Chicago ("UIC") hospital, when the prison referred him there for potential surgery to

5

improve his condition, that "the pain is never relieved, but soft collar and hot packs help to reduce severity of pain." (Discharge Summary (Jul. 11, 2012), Ex. 24 to Pl.'s Resp. to IDOC SOF [168-25].)[4]

The record includes some inconclusive information on the medical necessity of the brace from medical professionals. As described below, Brown eventually had surgery on his neck to prevent further degeneration of his condition. Dr. Konstantin Slavin, the surgeon at UIC who examined Brown in preparation for the surgery, was questioned about the need for a brace at his deposition. Initially, Slavin explained that he prescribed a neck brace to stabilize Brown before surgery:

Q:     . . . At this time our recommendation is for the patient's neck to be immobilized in a hard collar . . . . Do you see that?

A:     Yes, I do.

Q:     And why was the recommendation that the patient's neck should be immobilized in a hard collar?

A:     That's a standard recommendation for situations like this.

Q:     What are the risks if it's not immobilized?

       [objection omitted]

A:     It's hard to say. It looks like he was without a collar for at least . . . a year and six months[5] prior to seeing him on that day since the original MRI in December of 2010, so we suggested having it . . . hoping to stabilize his neck and avoid having any new symptoms prior to the surgery.

---

[4]     Brown's position, reflected in these documents, that the collar relieved pain or prevented occasional pain, is not plainly raised in his Local Rule 56.1 Statements. (*See* Pl.'s Resp. to IDOC SOF ¶ 16 (disputing IDOC's characterization of Dr. Slavin's testimony); Pl.'s Resp. to Wexford SOF ¶ 22 (generally disputing paragraph containing sentence that "brace was issued to provide comfort and is not curative.").) It is unavoidable based on this record, however, that Brown would so testify at trial. In this posture, to discount Brown's position would value form over substance, and the court will not do so. FED. R. CIV. P. 56(c)(3) (court may, in its discretion, consider other materials in record).

[5]     This appears to be a counting error. As the court understands it, Mr. Brown's neck brace was confiscated on October 28, 2011 (IDOC SOF ¶¶ 31–32), and he was given a new, soft-collar brace on May 30, 2012 (Pl.'s SOF to IDOC ¶ 63), a seven-month period.

Q:     So his condition could have gotten worse if he wasn't wearing the neck brace?

[objection omitted]

A:     Yes, we were concerned that would be the case.

(Dep. of Dr. Konstantin Slavin, Ex. G to IDOC SOF [hereinafter "Slavin Dep."] [155-6], at 23:20–24:22.)   Dr. Slavin also recognized, however, that a neck brace would not prevent the degeneration of Brown's condition.   (Slavin Dep. 27:8–11 ("Neck brace is more of a protective measure, I wouldn't call it a treatment"); *id.* at 30:21–31:2 ("Q: Would wearing a neck brace help reduce the progression of myelopathy[?] A: Not as I know. Q: What about the progression of cervical stenosis? A: I don't think so."); *id.* at 43:17–18 ("I don't know if wearing a collar makes people better or worse."); *id.* at 43:24–44:2 ("I thought [the x-rays showed the condition as] slightly worse, but I cannot ascribe it to wearing or not wearing a collar.").)

The remaining medical testimony on this issue all comes from Defendants.   Dr. Ghosh suggested that the brace was issued to "comfort" Brown, but provides no further details:

Q:     Why would you issue him a cervical collar?

A:     Well, he said he needed a brace, something for his neck, so I thought I would issue him one.  Not that it's curative, just to give him some comfort.

(Ghosh Dep. 32:2–6.)

Dr. Carter was the medical director of Stateville between July 25, 2011 and May 13, 2012.   (Pl.'s Resp. to Wexford Def.'s Rule 56.1 Statement [hereinafter "Pl.'s Resp to Wexford SOF"] ¶ 14.)   On October 11, 2011, Carter and another doctor, identified in Dr. Carter's deposition only as "Dr. Baker," reviewed Brown's treatment plan.   (Dep. of Dr. Imhotep Carter, Ex. E to Wexford SOF [hereinafter "Carter Dep."] [150-5], at 36:15–38:20.)   Dr. Carter described a neck brace as a "conservative measure" to treat Brown's spinal condition; he did not say anything else about the function of the neck brace.  (Carter Dep. 38:9–20.)

Dr. Obaisi has only been employed with Wexford since July 2012 (Dep. of Dr. Saleh Obaisi (Jun. 1, 2015), Ex. 1 to Pl.'s Resp. to Wexford SOF [hereinafter "Obaisi Jun. 1, 2015 Dep."] [169-2], at 52:11–21), and only examined Brown after Brown's spine surgery. (*See* Obaisi Jun. 1, 2015 Dep. 49:12–51:12 (reviewing July 13, 2012 medical notes)). Obaisi does not offer an opinion on the necessity of the neck brace during the period before Brown had surgery.

Brown's spinal condition is degenerative, and the prison medical staff ultimately referred him to UIC for evaluation of his worsening condition. Precisely who made the referral, or what prompted it, is not clear from the record. On April 16, 2012, Brown saw Dr. Slavin at UIC, who recommended that Brown have surgery on his spine, though the record is unclear as to what surgery Dr. Slavin suggested on that date. (Pl.'s SOF to IDOC ¶ 57.) It was at that appointment that Dr. Slavin recommended that Brown's neck be stabilized in a hard-collar brace. (Slavin Dep. 23:19–24:22.) In response, Stateville's central supply staff did give Brown a neck brace, though it was a soft-collar brace, not the hard collar that Slavin requested. (Pl.'s SOF to IDOC ¶ 63; Receipt (May 30, 2012), Ex. 23 to Pl.'s Resp. to IDOC SOF [168-24].) Brown had another appointment with Dr. Slavin on May 7, 2012, at which Dr. Slavin advised an anterior cervical discectomy and fusion at the C5-C6 and C6-C7 levels. (Slavin Dep. 18:7–12.) The surgery was intended to stop the progression of Brown's disease and relieve pain. (*Id.* at 19:10–20:3.) Brown had the surgery on July 3, 2012 (Pl.'s SOF to IDOC ¶ 65), and stayed in the hospital for eight days due to complications. (*Id.* at ¶ 66.) Upon his discharge on July 11, 2012, UIC recommended a follow-up appointment in two weeks. (*Id.* at ¶ 67.)

In fact, however, the appointment was not scheduled to occur until August 17, 2012.

(*Id.* at ¶ 71.)[6]  This initial delay is not explained by Defendants.  And the appointment did not take place on August 12.  On that date, Nurse Madonna Maikaitis discovered that Brown had a lift in his shoe for which she believed he did not have a permit.  (*Id.*)  Nurse Maikaitis responded to the discovery by refusing to permit Brown to leave Stateville for his scheduled appointment.  The record does not disclose how Nurse Maikaitis became aware of the lift nor why prohibiting an inmate from seeing the doctor was an appropriate sanction for possession of a lift without a permit—a sanction that presumably inconvenienced the doctor at UIC as well.  Nurse Maikaitis testified at her deposition that there was a blanket policy at Stateville that if an inmate did not have a permit for a medical device, the inmate could not take the device out of the prison (Dep. of Madonna Maikaitis, Ex. H to Wexford SOF [hereinafter "Maikaitis Dep."] [150-8], at 32:3–22), but the court is uncertain why she did not simply seize the lift and send Brown on his way.

Nurse Maikaitis further testified that between 30 and 60 days after Dr. Obaisi became the medical director, he established a policy that nurses could call him and get a "telephone order" to allow an inmate to take a medical device out of the prison.  (Maikaitis Dep. 23:4–24, 24:6–8.)  Obaisi became the medical director on an unspecified date in July 2012.  (*See* Obaisi Jun. 1, 2015 Dep. 52:11–21.)  Nurse Maikaitis does not remember the incident with Brown (*id.* at 34:13–16), and said nothing in her deposition about whether she attempted to arrange a telephone order for Brown, or whether that policy was in place at the time.

The parties dispute whether Brown had a permit for the lift at the time of this incident.  Brown points to a medical note and "referral" on March 23, 2012 which, Brown claims, reflects that medical staff (the signature is illegible) renewed the permit for six months from that date.  (IDOC, Offender Outpatient Progress Notes (March 23, 2012), Ex. 26 to Pl.'s Resp. to IDOC SOF [168-27].)  The parties do not dispute that the permit for the lift was renewed a few days

---

[6]     This point is evidently disputed by the IDOC Defendants because Plaintiff does not cite the record for the date of this follow-up appointment.  (IDOC Resp. to Pl.'s SOF ¶ 71.)  However, they do not deny that there was an appointment that day.

after he was prevented from leaving, on August 20, 2012. (IDOC Resp. to Pl.'s SOF ¶ 71.) There is also no genuine dispute that as a result of Nurse Maikaitis's discovery of his shoe lift, Brown was not seen at UIC until February 25, 2013—eight months after his surgery. (Pl.'s SOF to IDOC ¶ 72.)[7] Defendants do note that he was seen by Dr. Obaisi, a day or two after being released from the hospital. (IDOC SOF ¶ 7; Wexford SOF ¶ 25.)

Brown asserts that Dr. Slavin's recommendation after the surgery included additional showers, referred to by the parties as "medical showers." There is no difference between a medical shower and a regular shower; medical showers are simply additional showers provided to inmates for some medical purpose. (*See* Pl.'s Dep. 214:6–215:9.) (The parties do not explain how many showers inmates are entitled to under normal circumstances.) In Brown's case, Dr. Slavin testified that he prescribed the showers to assist in keeping the "cervical muscles more relaxed." (Slavin Dep. 37:11–14.)[8] Brown confirms that the hot water helped with his sore back. (Pl.'s Dep. 213:20–214:5.) Brown claims that Defendants denied this treatment, as well. According to Brown, Dr. Slavin recommended daily showers immediately after surgery. (Pl.'s SOF to IDOC ¶ 68.) Defendants dispute this, however. (IDOC Resp. to Pl.'s SOF ¶ 68; Wexford Answer to Pl.'s Statement of Add'l Facts [hereinafter Wexford Resp. to Pl.'s SOF] [185], at ¶ 46), and there is no indication in the discharge summary that Dr. Slavin ordered daily showers. (UIC Medical Center Discharge Summ. (Jul. 11, 2012), Ex. 4 to Pl.'s Resp. to IDOC SOF [168-25], at 4 (noting only "OK to shower").) There is no dispute that, back

---

[7]     The IDOC Defendants dispute some portion of this paragraph in Plaintiff's statement of facts, but is unclear whether they dispute the fact that Brown did not receive a follow-up appointment between July 2012 and February 25, 2013. To the extent they do dispute that fact, they do not produce contrary evidence to show he was seen at UIC before this date. (IDOC Resp. to Pl.'s SOF ¶ 72.)

[8]     Dr. Slavin offers this prescription in his February 25, 2013 report. In this report, he also says that daily showers were important to keep the incision clean and dry. (Neurosurgery Note, Ex. 28 to Pl.'s Resp. to IDOC SoF [168-29], at 2.) By February 2013, Dr. Slavin's notes show, the incision was "completely healed" and there was no evidence of infection or inflammation. (*Id.* at 1.)

at the prison on July 13, 2012, Dr. Obaisi ordered only three additional showers per week as part of the post-operative treatment plan. (Pl.'s SOF to IDOC ¶ 69.) Dr. Obaisi testified that the three additional showers were his own recommendation. (Obaisi Jul. 15, 2015 Dep. 92:15–22.) On February 25, 2013, when Brown finally got his follow-up appointment, Dr. Slavin recommended that he have daily showers. (Neurosurgery Note, Ex. 28 to Pl.'s Resp. to IDOC SOF [168-29], at 2.) Brown does not suggest that Slavin's recommendation was followed after that date. (Pl.'s SOF to IDOC ¶ 69.)

Brown claims that on one occasion, a corrections officer abused his authority by terminating Brown's shower early in February 2013 (Pl.'s Resp. to IDOC SOF ¶ 39), and the health care unit administrator, Royce Brown-Reed, did nothing about it. (Pl.'s Resp. to IDOC SOF ¶ 38(a)–(d).) Brown filed a grievance detailing this incident, which the grievance office forwarded to the health care unit. (Offender's Grievance #M191 (February 13, 2013), Ex. 12 to Pl.'s Resp. to IDOC SOF [168-13].) The health care unit responded with a memorandum that purports to be from Brown-Reed (Mem., Brown-Reed to Grievance Office (Apr. 22, 2013), Ex. 14 to Pl.'s Resp. to IDOC SOF [hereinafter HCU Grievance Mem.] [168-15]), but Brown-Reed testified at her deposition that the document was produced by her assistant, Valerie Christensen. (IDOC SOF ¶ 41; Dep. of Royce Brown-Reed, Ex. D to IDOC SOF [hereinafter "Brown-Reed Dep."] [155-4], at 33:18–12.) She further testified that she does not review all memoranda authored by her assistant prior to issuing them (IDOC SOF ¶ 43), and it is unclear from her deposition whether she reviewed this one. (Brown-Reed Dep. 32:17–18 ("Q: Okay. Do you recognize this? A: I recognize the format, yes.").) The memo states that the "grievance is a security issue," and finds that it has "no merit." (HCU Grievance Mem.) Brown-Reed testified that if a grievance is determined to be a security issue, the grievance office sends the grievance to "security" to be addressed and she does not investigate further. (Brown-Reed Dep. 33:19–

34:9.)  The record contains no more information about what happened with the grievance, why it was characterized as a security issue, or to whom "security" refers.

## II.   Issues Related to Brown's Eye Condition

Brown also claims that prison staff have been indifferent to his needs related to his eyes. Brown has glaucoma.  (Wexford SOF ¶ 16.)  For this condition, he takes four different kinds of eye drops.  (*Id.* at ¶ 17.)  Brown claims that there have been serious problems with the distribution of this medication that have resulted in his not receiving it on several occasions.

Brown's concerns about his eye drops began with a shakedown of Brown's cell, early in his stay at Stateville, where a security officer confiscated them.  (Pl.'s Resp. to Wexford SOF ¶ 19(c).)  Brown does not recall exactly when this occurred,[9] but he testified that as a result, he requested some method of administering his eye drops that did not require him to keep them in the cell.  (Pl.'s Dep. 135:24–136:7.)  First, the drops were ordered to be administered on a "watch take" basis, which means that the drops were given to him for self-administration, supervised by a nurse, and then returned to the nurse.  (Pl.'s Resp. to Wexford SOF ¶ 20(a).)  The date that this practice began is not in the record; Brown does not recall the date in his deposition.  (*See* Pl.'s Dep. 136:14–18.)

Things did not go smoothly even during the "watch take" period.  On one occasion, around August 2012, Brown contends that Nurse Tiffany Utke insisted that Brown keep the eye drops in his cell, and when he refused, she refused to give him the drops at all.  (Pl.'s Resp. to Wexford SOF ¶ 20(j).)  Brown, at his deposition, explained:

---

[9]     This incident is only substantiated in the record by Brown's testimony at his deposition.  (Pl.'s Dep. 136:22–137:6.)  The IDOC Defendants "do not dispute that Plaintiff so testified," and otherwise do not address whether this incident happened.  (IDOC Resp. to Pl.'s SOF ¶ 74.)  As to the Wexford Defendants, the description of this incident only occurs in Brown's response to their statement of facts, and not in the separate statement of facts to which they responded.

Q:       You refused to take them, right?

A:       I refused to – this is exactly what I said.  I said, I will take the eye drops, I
         will put them in my eye, and I will give them back to you.  And she say no,
         you can keep them.  And I say, well, no.

(Pl.'s Dep. 163:1–6.)  Wexford's counsel questioned Brown about a form, filled out by an

unknown party on August 20, 2012, which stated that Brown refused his medication.  (*Id.* at

183:3–183:20.)  The court suspects that this refusal form was the memorialization of the August

2012 incident, filled out by Nurse Utke or someone else, though the form itself was either not

produced to the court, or no party has directed the court to it.

     Nurse Aletha Harper also allegedly "refused to administer the eye drops watch take" on

or around May 25, 2012.  (Pl.'s Resp. to Wexford SOF ¶ 20(k).)  Though Brown's statement of

facts does not explain exactly what this means, the court assumes that the allegation is that

Harper similarly was willing to give Brown the drops only if he agreed to keep them in his cell, in

violation of the "watch take" order.  Harper testified at her deposition that she offered him his

medications and he refused.  (Dep. of Aletha Harper, Ex. J to Wexford SOF [hereinafter "Harper

Dep."] [150-10], at 43:10–15.)  According to Brown, "[t]hese incidents happened routinely and

repeatedly with each of these nurses . . . ." (*id.* at ¶ 20(l)), after which the nurses would fill out

refusal forms.  (*Id.* at ¶ 20(q).)  At Brown's deposition, both Brown and Wexford's counsel

referenced many other refusal forms (Pl.'s Dep. 186:13–22, 239:12–22), but if they were

produced to the court, they are not clearly identified in the parties' statements of fact.

     Brown also claims that Nurse Cynthia Garcia cancelled a "watch take" administration of

the eye drops after Dr. Obaisi ordered that they should be so administered (*id.* at ¶ 20(n));

Garcia allegedly cancelled the "watch take" order around September 2012.  (Pl.'s Dep. 158:22–

159:6.)  The record does not disclose the procedure for Brown's eye drop administration

between September 2012 and August 2013.  Dr. Obaisi entered another "watch take" order in

August 2013.  (IDOC, Offender Outpatient Progress Notes (Aug. 13, 2013), Ex. K to Wexford

SOF [150-15]). The order notes that Brown requested the "watch take" order because Brown was concerned that if he "kept eye drops in his cell someone would tamper with it," and Brown agreed to come to the health care unit to take his eye drops "as watch take." (*Id.*; Obaisi Jun. 1, 2015 Dep. 112:12–16.)

Brown claims that on another occasion in September 2013, Nurse Wendy Dybas did not want to supervise his taking the drops because she wanted a cigarette break.[10] (Pl.'s Resp. to Wexford SOF ¶ 20(b).) Brown told her that if she did not want to do her job, she should find another one. (*Id.* at ¶ 20(c).) She allegedly replied that she did not want to "babysit" him (*id.* at ¶ 20(d)), and wrote him a rule violation ticket. (*Id.* at ¶ 20(e).)[11] Brown's statements of fact are silent on whether he received his eye drops during this incident. Nurse Dybas, reviewing the rule violation form at her deposition, testified that Brown insisted that she supervise him while he administered the eye drops, though the doctor had not ordered that Brown had to be observed while he administered the medication. (Dep. of Wendy Dybas, Ex. F to Wexford SOF [150-6], at 30:20–31:4.) She told Brown that she believed she did not have to supervise him, and she claims he threatened to file a grievance and have her fired. (*Id.* at 31:4–12.) Her deposition is similarly silent on whether Brown received his eye drops. On the record before the court, it does seem that there was a "watch take" order in place at this time, which means, as the court understands it, that Dybas was to supervise Brown.

Brown asserts that after the incident with Nurse Dybas in September 2013, the drops were distributed to Brown during "med pass," a procedure in which a nurse would give the drops to him in his cell and collect the drops at the end of the rotation. (Pl.'s Resp. to Wexford SOF

---

[10]    The court gathers from the report that Nurse Dybas filed that this incident occurred on September 20, 2013, but the parties have not bothered to provide the date in any statement of facts. (Dep. of Wendy Dybas, Ex. F to Wexford SOF [150-6], at 30:2–33:13.)

[11]    This exchange is produced only in Brown's response to the Wexford statement of facts, and not in his separate statement of facts to which Wexford responded. (Pl.'s Resp. to Wexford SOF ¶ 20(b)–(e).)

¶ 20(g).)  Brown cites his own testimony for this, though he does not produce a corresponding order in the record.  (*Id.*)  Eventually, "med pass" stopped, though Brown did not explain in his deposition when or why.  (*See* Pl.'s Resp. to Wexford SOF ¶ 20(i).)  The only order in the record after August 2013—at least, the only order to which the parties have drawn the court's attention—is that Dr. Obaisi discontinued the "watch take" order in October 2013 for reasons Obaisi could not recall (Obaisi Jun. 1, 2015 Dep. 115:12–15), and no order appears to have replaced it.

Brown keeps the medicine in his cell now (Pl.'s Dep. 147:1–15), and he has not had an incident with the medication being confiscated.  (*Id.* at 148:8–12.)

## III.  Brown's Crutch

Brown's final medical concern relates to his need for a crutch.  Brown has had a medical permit for a crutch for substantially the entire time he has been at Stateville.  (Pl.'s Resp. to Wexford SOF ¶ 30(d).)  On February 26, 2015, Dr. Obaisi discontinued Mr. Brown's medical permit for the crutch.  (*Id.* at ¶ 30(e).)  Brown alleges that Dr. Obaisi did so in retaliation for this lawsuit; in support, Brown notes that the permit was discontinued approximately two days after Dr. Obaisi filed his answer.  (*Id.*; *see* Obaisi Answer [89] (filed Feb. 24, 2015).)  Dr. Obaisi claimed, in his first deposition, that the reason he discontinued the crutch permit was that he had seen Brown walking without the aid of the crutch on numerous occasions over the course of two years.  (Obaisi Jun. 1, 2015 Dep. 97:6–99:4; 100:18–23.)  In his second deposition, however, Dr. Obaisi denied ever seeing Brown without the crutch.  (Dep. of Dr. Saleh Obaisi (Jul. 15, 2015), Ex. 2 to Pl.'s Resp. to Wexford SOF [hereinafter "Obaisi Jul. 15, 2015 Dep."] [169-3], at 77:9–11.)  Dr. Obaisi was consistent, however, in saying that because the neck surgery was successful in July 2012, Brown did not need the crutch anymore.  (Obaisi Jun. 1, 2015 Dep. 95:7–96:12; Obaisi Jul. 15, 2015 Dep. 77:12–78:6.)  Brown, for his part, reports that Dr. Obaisi simply told him at an appointment on February 24, 2015 that Dr. Obaisi did not want

Brown to have the crutch anymore. (Pl.'s Resp. to Wexford SOF ¶ 30(f).) Brown claims that not having the crutch severely impeded his ability to get around Stateville, preventing him from getting to medical appointments, the cafeteria, the law library, and an attorney appointment. (*Id.* at ¶¶ 30(p)–(aa).) He asserts that he lost more than ten pounds during this period because, without a crutch, he could not leave his cell to get to the cafeteria. (*See id.* at ¶ 30(bb).)

Brown's attorneys sent a letter to the court on March 8, 2017, noting that Brown had a follow-up appointment with Dr. Slavin on January 30, 2017. (Letter to Court Regarding Mr. Brown's Medical Records (Mar. 8, 2017) [193], at 1.) Though Brown's counsel has not yet been able to obtain the medical records from the visit, despite their efforts since February 1, 2017, Brown reported that Dr. Slavin recommended that he "should continue to use the crutch or a walker . . . ." (*Id.*)

## IV.    Failure to Intervene

Brown's final claim is that two of the defendants willfully ignored his repeated requests and complaints. First, he notes that Royce Brown-Reed, the health care unit administrator at Stateville, was responsible for investigating inmate grievances related to health care (Brown-Reed Dep. 23:22–24:5), and making health care staff aware of what permits inmates had. (*Id.* at 22:9–23:7.) Brown claims that she failed to adequately respond to his grievances or follow up regarding his expired medical permits. (Pl.'s Resp. to IDOC SOF ¶¶ 38(a)–(d).)

One grievance, the February 2013 grievance regarding the shower, is described above. Unfortunately, Brown does not identify which other grievances were directed to Brown-Reed and ignored. (*See* Pl.'s Resp. to IDOC SOF ¶¶ 38–46; *see also* Pl.'s Br. Opp. to IDOC 13.) In his complaint, Brown lists sixteen grievances (3d Am. Compl. [111], at ¶¶ 27, 28), and contends that all "were [] overlooked by Ms. Brown Reed who, as hospital administrator, [had the responsibility to] investigate the documents closer." (*Id.* at ¶ 29.) Brown has produced five grievances, in addition to the February 2013 shower grievance, to the court. In the first of these,

filed on October 27, 2011, Brown complains that he has not been able to get his permits renewed for his brace and his crutch. (Offender's Grievance #4070 (Oct. 27, 2011), Ex. 6 to Pl.'s Resp. to IDOC SOF [168-7].) The grievance was sent to the health care unit, but there is no response in the record from Brown-Reed or any of her staff. (*Id.*) The next grievance, filed November 8, 2011, describes the incident when Grubbs seized the brace and requests help in getting the brace back. (Offender's Grievance #4155 (Nov. 8, 2011), Ex. 7 to Pl's Resp. to IDOC SOF [168-8].) The grievance office did not send this grievance to the health care unit because it was apparently a duplicate of a grievance to which staff had already responded (*id.*), though neither the earlier grievance nor the response to it appears in the record. Third, Brown filed another grievance on December 9, 2011, describing the incident with Grubbs as well as the problems Brown was experiencing with administration of the eye drops. (Offender's Grievance #4617 (Dec. 19, 2011), Ex. 8 to Pl.'s Resp. to IDOC SOF [168-9].) Brown asserted that Grubbs violated a doctor's order in taking Brown to segregation:

> [A]t that time there was A Doctor's Order to place me on Med Watch, (meaning that the Nursing must Give me all of my Medical Med's to asure that Security do not take my Med's Or anything else medical, Or send me to Segregration any more. (Illegally.) Since this order was issued I have been issued all Med's but my Eye Med's."

(*Id.* (errors in original).) This, too, was deemed a duplicate (*id.*), but again, neither the preceding complaint nor the response are in the record.

Fourth, Brown filed a grievance on January 3, 2012, directed solely at Marcus Hardy, Stateville's warden (discussed further below), in which he summarized his previous medical grievances that had not been addressed. (Offender's Grievance #4686 (Jan. 3, 2012), Ex. 9 to Pl's Resp. to IDOC SOF [168-10].) The grievance office has no notes about what it did with this grievance, so the court concludes that it was not sent to the health care unit. Finally, Brown filed another grievance on July 27, 2013, reporting that he was not getting the additional showers that Dr. Slavin had ordered. (Offender's Grievance #3206 (Jul. 27, 2013), Ex. 13 to

Pl.'s Resp. to IDOC SOF [168-14].)  A response appears on the grievance form.  (*See id.*)  The staff member, not a defendant to the lawsuit, rejected the grievance.  She explained (somewhat inscrutably) that "staff gave you the opportunity to take 3 medical showers.  It is not your discretion on how many showers you take after medical shower."  (*Id.*)

As noted, Brown-Reed's staff was aware of the February 2013 grievance because they responded to it.  *Supra* pp. 11–12.  The parties have not addressed whether Brown-Reed knew of any of the other grievances.  Brown states in his deposition that he spoke with Brown-Reed in person on several occasions about the subject of the grievances (Pl.'s Dep. 226:9–227:16), but recalled the details of just one communication; he does not remember the date but remembered that he complained to her, to Dr. Obaisi, and to Dr. Funk (no longer a party to this suit) about the fact that he needed to receive his eye drops "watch take."  (*Id.* at 227:17–228:11.)

In addition to Ms. Brown-Reed's failure to respond to his grievances, Brown alleges that many of his grievances were reviewed and ignored by Marcus Hardy, Stateville's warden during the relevant period.  Brown filed the October 27, 2011 grievance as an emergency, requesting medical permits for his neck brace and crutch.  (Pl.'s Resp. to IDOC SOF ¶ 18(a); Offender's Grievance #4070.)  The grievance was returned with a notation that it was not an emergency, and Marcus Hardy's name was signed on that part of the grievance.  (Pl.'s Resp. to IDOC SOF ¶ 18(a).)  Brown also filed his November 8, 2011 grievance as an emergency grievance, and it was similarly returned, signed by Marcus Hardy, again with no action other than a notation that it was not an emergency.  (*Id.* at ¶¶ 18(c)–(d); Offender's Grievance #4155.)  This occurred yet again for the grievance on December 19, 2011.  (Pl.'s Resp. to IDOC SOF ¶ 18(e)–(f); Offender's Grievance #4617.)  According to Hardy, grievances are typically reviewed and signed by a designee, not by Hardy himself (IDOC SOF ¶ 19), and Hardy never personally reviewed the grievances.  (*Id.* at ¶ 21.)  Brown contends, however, that he spoke with Hardy directly about the neck brace (Pl.'s Resp. to IDOC SOF ¶ 22), and about the additional showers.

18

(*Id.* at ¶ 23).  Hardy told Brown to sign up for "sick call" in an effort to get the permit for the brace back (*id.* at ¶ 22); Brown does not say how Hardy responded to his concern about showers.

Brown brought suit against numerous prison and medical staff.  He claims that they were deliberately indifferent to his medical needs and that Dr. Obaisi retaliated against him after he filed suit, in violation of 42 U.S.C. § 1983.  Remaining in the suit are Grubbs, Brown-Reed, and Marcus Hardy (the "IDOC Defendants") and Nurses Maikaitis, Dybas, Harper, and Garcia, and Doctors Carter and Obaisi (the "Wexford Defendants").[12]  The Wexford Defendants are not employed directly by IDOC, but work instead for the independent contractor that provides the medical services of the prison.  Both groups of defendants have moved for summary judgment.  The IDOC Defendants further argue that they are entitled to qualified immunity.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The facts are assessed in the light most favorable to the party opposing the motion, here, the plaintiff.  *Dawson v. Brown*, 803 F.3d 829, 832 (7th Cir. 2015).  The plaintiff must produce evidence upon which a jury could reasonably find for him; a "mere scintilla" of evidence in support of a claim is insufficient at this stage.  *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008).

---

[12]  Brown named Dr. Arthur Funk and "K. Laskey" as Defendants in his original complaint, but the court found in its initial review of Brown's case that he had not alleged facts to put Funk on notice of the claim against him (Order (Oct. 13, 2013) [12], at 2), and that Brown had not stated a due process claim against Laskey, who had placed Brown in segregation, because inmates do not have a liberty interest in avoiding confinement in the segregation unit at Stateville.  (*Id.* at 2–3); *Williams v. Ramos*, 71 F.3d 1246, 1249–50 (7th Cir. 1995).  Brown also sued Christopher Medin, a corrections officer, who was voluntarily dismissed with Brown's filing of his third amended complaint in August 2015 (3d Am. Compl. [111]), and Dr. Ghosh, who was dismissed by stipulation on August 4, 2016.  (Order (Jun. 4, 2016) [180].)

<u>**DISCUSSION**</u>

**I.      Compliance with Local Rule 56.1**

The IDOC Defendants introduce a preliminary issue: whether Brown violated Local Rule 56.1 by offering factual allegations in response to their 56.1 statements, rather than solely in a separate and independent statement of facts.  (IDOC Defs.' Reply [178], at 2.)  IDOC requests that all of Defendants' factual statements answered in this way be deemed admitted.  (*Id.*) Local Rule 56.1(b)(3) requires the party opposing a motion for summary judgment to do two things: to respond to each of the movant's allegations, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon," N.D. ILL. LOCAL R. 56.1(b)(3)(B), and produce a separate statement of additional facts that require the denial of summary judgment, N.D. ILL. LOCAL R. 56.1(b)(3)(C). The language of the rule might be more explicit, but the court does not read it as prohibiting introduction of factual material in response to the moving party's 56.1 statement; indeed the rule arguably contemplates this by its reference to citations to the record.  N.D. ILL. LOCAL R. 56.1(b)(3)(B).

The IDOC Defendants cite various cases where allegations were admitted for 56.1 violations, but the cases, where applicable, do not require the court to deem the allegations admitted.  In *Raymond v. Ameritech Corp.*, the responding party filed no timely 56.1 statement at all.  442 F.3d 600, 604 (7th Cir. 2006).  In *Smith v. Lamz*, the responding party provided no citations to the nearly 100 pages of record attached to his response.  321 F.3d 680, 683 (7th Cir. 2003).  Neither of those situations applies here.  The Seventh Circuit did hold in *McGuire v. United Parcel Service* that including additional facts in the response to the movant's allegations was "inappropriate."  152 F.3d 673, 674–75 (7th Cir. 1998).  In upholding the district court's exercise of its discretion, however, *McGuire* does not hold that the district court is forbidden to

consider facts introduced in response to the movant's allegations. *McGuire*, 152 F.3d at 675 ("The district court strictly enforced the local rules against McGuire, and we will do likewise.").

The court will exercise its discretion to consider the facts produced in Brown's responses to the Defendants. Defendants could have responded to the additional facts produced, and if concerned about the propriety of doing so, could have requested leave of court. Accordingly, the IDOC Defendants' request that all of their allegations be deemed admitted is denied.

## II.    Legal Standard for Indifference to Medical Needs

The Eighth Amendment prohibition against cruel and unusual punishment encompasses "deliberate indifference to serious medical needs of prisoners . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Prison officials are liable for deliberate indifference if they "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate medical indifference accordingly has two elements: "(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). The court looks to the "totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

A serious medical need "includes both diagnosed conditions requiring treatment and conditions 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Williams v. Liefer*, 491 F.3d 710, 714 (7th Cir. 2007) (quoting *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000)). Defendants have not disputed the seriousness of Brown's medical conditions, and the court agrees that his spinal condition and glaucoma are serious medical needs.

The second prong requires that the "defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference."

*Whiting v. Wexford Health Sources, Inc.*, 839 F.3d. 658, 662 (7th Cir. 2016). The inquiry is necessarily subjective. *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016). Non-medical prison staff can "rely on the expertise of medical personnel," because if the prisoner is "under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011).

For medical officials, "an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain . . . ." *Estelle,* 429 U.S. at 105 (internal quotations omitted). Thus, medical negligence is not sufficient to state a claim for deliberate indifference. *Whiting*, 839 F.3d at 662. On the other hand, "where evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to [the] risk of the harm that they caused." *Pettie*s, 836 F.3d at 731. Prison medical staff are not absolutely bound to follow the recommendations of outside doctors; the prison doctor is "free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). A medical provider may, however, exhibit deliberate indifference where he or she "choose[s] an easier and less efficacious treatment without exercising professional judgment." *Arnett*, 658 F.3d at 754.

### III.   Corrections Officer Shawnel Grubbs

Brown argues that Grubbs was deliberately indifferent because it is obvious that someone wearing a neck brace has a serious medical condition, and that removing the brace poses a substantial risk of harm. (Pl.'s Br. Opp. to IDOC at 9.) That argument certainly has surface appeal, but the court notes that Grubbs was entitled to rely on the medical permit system. Because permits are issued by the medical staff, it was reasonable—or at least not

unconstitutionally reckless—for Grubbs to conclude that the device was not medically necessary, and that taking it did not pose a substantial risk of serious harm to Brown.

Grubbs acknowledged that he was not required to confiscate the brace. He could have called the healthcare unit to determine whether or not Brown had a valid permit (Grubbs Dep. 37:14–39:19), or done Brown a favor and let him keep it. (*Id.* at 52:20–24.) His choice not to do so, however, does not violate the Constitution. There is nothing in the record to show that Grubbs had a reason to doubt the medical permit system, the very purpose of which seems to be to define what is permitted medical equipment and what is prohibited contraband. Without evidence that Grubbs knew the medical permit system was unreliable, there is no basis to find that his confiscating an apparently unapproved medical device (that is, contraband) was subjective indifference to Brown's medical condition. Summary judgment is granted as to Grubbs.

## IV.    Dr. Imhotep Carter

Dr. Carter was the medical director at Stateville from July 25, 2011 to May 13, 2012. (Wexford SOF ¶14.) Brown alleges that Dr. Carter was deliberately indifferent to his spinal condition by failing to ensure that the permit for his neck brace was renewed, resulting in his being deprived of the brace between October 2011 and May 2012. (3d Am. Compl. at ¶ 46*; see also* Pl.'s Resp. to Wexford SOF ¶ 3.)

A delay in providing medical treatment can be a basis for a deliberate indifference claim. Whether the delay constitutes deliberate indifference "depends on the seriousness of the condition and the ease of providing treatment." *Petties*, 836 F.3d at 730. To prove that a delay in providing treatment is a violation of the Eighth Amendment, "a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Id.* at 730–31 (citing *Williams*, 491 F.3d at 716). This standard is also known as the "verifying medical evidence" requirement; courts require the plaintiff to produce medical evidence that the

delay itself, rather than the underlying condition, caused harm. *Williams*, 491 F.3d at 714–15 (citing *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (adopting "verifying medical evidence" requirement)).

There is a genuine dispute of fact about whether the brace was medically necessary, either to prevent degeneration of Brown's condition, or simply to provide Brown some protection from pain in the event of jostling or a fall. In addition to Brown's own testimony that the brace was necessary, the court notes that the permit for the brace was renewed at least twice by Dr. Ghosh, and—interpreting the facts in the light most favorable to Brown—renewed yet again by another member of the medical staff. (IDOC, Offender Outpatient Progress Notes (Jun. 17, 2011).) Furthermore, Dr. Slavin prescribed a brace to Brown before surgery. Though Dr. Slavin's testimony is far from clear as to whether the brace was necessary to prevent the progression of the disease, he did understand the brace was appropriate "to stabilize [Brown's] neck and avoid having any new symptoms prior to the surgery." (Slavin Dep. 23:19–24:22.) Even if the brace was not necessary to prevent progression of the Brown's disease, there is a genuine dispute about whether the brace alleviated pain or prevented further injury (Ghosh Dep. 32:2–6 (noting the brace provided "comfort" to Brown)), which may be why Dr. Carter maintained the brace as one of the "conservative measures" in Brown's treatment plan. (*See* Carter Dep. 38:9–20.) A reasonable jury could conclude that the brace was medically necessary for one or both of these purposes.

The medical director at Stateville is responsible for all inmate health care, and for providing a timely and efficient response to inmates' health care needs. (Pl.'s SOF to Wexford ¶ 47; Ghosh Dep. 14:24–15:5.) A reasonable jury could infer that Dr. Carter, as the medical director, was aware of Brown's need for the renewal, particularly because he had reviewed Brown's treatment plan. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the

usual ways, including inference from circumstantial evidence . . . ."). Accordingly, summary judgment as to Dr. Carter is denied.

## V.     The Eye Drops

Brown maintains that he needs to receive his eye medication for his glaucoma under the "watch take" procedure, or through some other method where he would not be forced to keep the medication in his cell with him. His reason for this is an incident early on in his time at Stateville where the medication was taken from him during a random cell shakedown. (Pl.'s Dep. 136:18–137:6.) But Brown keeps the medicine in his cell now (*id.* at 147:1–15), and it appears he has not had an incident since. (*Id.* at 148:8–12.) Taking the facts in the light most favorable to Brown, forcing him to keep the medicine in his cell simply poses a risk that security staff may make another mistake and take the medicine from him.

Under these circumstances, requiring Brown to keep the drops in his cell is not deliberate indifference to Brown's needs. At most, the prison staff is deliberately indifferent to the possibility that security staff will make a mistake. That level of indifference is not a constitutional violation because it does not pose an excessive risk to his health or safety. *See Farmer*, 511 U.S. at 837 ("[A] prison official cannot be found liable . . . unless the official knows of and disregards an excessive risk to inmate health . . . ."). It is worth noting that the Wexford Defendants have not offered any particular explanation for why keeping Brown's medication with the Wexford staff, rather than in Brown's cell, was burdensome to them. On the other hand, Brown has not substantiated his claim that their refusal to do so is deliberately indifferent. If the eye drops are left in his cell, there is a chance they will be confiscated, but the only evidence in the record to establish the probability of that occurrence is that it happened once.[13] Ignoring a substantial likelihood of injury is the essence of deliberate indifference, and that is not

---

[13]     A claim like this is more properly directed against the security staff for confiscating necessary medication, rather than the nursing staff for failing to prevent the confiscation. Brown makes no such claim against the security staff here.

established here. Accordingly, summary judgment is granted to Nurse Garcia and partial summary judgment to Dr. Obaisi on the issue of failing to establish "watch take" orders for Brown's eye drops.

Turning to the claims against the other nurses, if Brown has established a dispute of material fact that the nurses refused to provide Brown's eye medication, that action would preclude summary judgment. But if the nurses made Brown's eye medication available to him, they were not deliberately indifferent to his need for the medication—even if the administration protocol was not what Brown would have preferred.

Brown alleges one incident with Nurse Dybas in which she told him that "she did not want to wait for Mr. Brown to get all of his drops in his eye because she wanted to take a smoke break." (Pl.'s Resp. to Wexford SOF ¶ 20(b).) The two had an altercation, and Nurse Dybas wrote him up. (*Id.* at ¶ 20(c)–(f).) Brown does not claim that he did not get his medication that day. Brown further alleges, in his statement of facts, that this type of incident happened "routinely and repeatedly" with Nurse Dybas and the other nurses. (*Id.* at ¶ 20(l).) However frustrating these episodes may have been, they do not satisfy the court that the nurses denied him his medication. The cited portion of deposition testimony clarifies that Nurse Dybas and the others offered the medication for him to keep, which he refused. (Pl.'s Dep. 239:12–240:12.) Nurse Utke, similarly, gave Brown the eye drops to keep in his cell, which he refused. (*Id.* at 162:14–164:12.) Making the medication available to Brown in this way was not deliberately indifferent to his needs. Therefore, summary judgment as to Nurse Dybas and Nurse Utke is granted.

Brown also states that that Nurse Harper refused to administer his eye drops in the "watch take" protocol (Pl.'s Resp. to Wexford SOF ¶ 20(k); Pl.'s Dep. 164:16–19), though again it is unclear whether this means he did not get his eye drops. She testified at her deposition that she offered him his medications and he refused. (Harper Dep. at 43:10–15.) Because that is

consistent with Brown's statement of the facts and his general allegations about the various nurses' practices (Pl.'s Dep. 162:14–164:12), the record only supports the conclusion that Harper offered the eye drops in the same way as the other nurses. Summary judgment is also granted as to Nurse Harper.

## VI.    Dr. Saleh Obaisi

Brown has several allegations against Dr. Obaisi: (1) that he failed to ensure that Brown was receiving his medications under a "watch take" order (3d Am. Compl. ¶ 53); (2) that he ordered only three medical showers per week after Brown's surgery rather than the daily showers recommended by Dr. Slavin (3d Am. Compl. ¶¶ 20; 47); (3) that he failed to ensure that Brown received the follow-up appointment Dr. Slavin recommended (3d Am. Compl. ¶ 47, Pl.'s Resp. to Wexford SOF ¶ 3(1)); and (4) that he intentionally took away Brown's crutch in retaliation for the lawsuit. (3d Am. Compl. ¶¶ 58–62; Pl.'s Resp. to Wexford SOF ¶ 3(2).) The court has already ruled on the "watch take" orders, *supra* pp. 25–27, so it now it turns to Brown's other claims.

### A.    Showers

Brown alleges that Dr. Obaisi was deliberately indifferent to his medical needs by ordering only three additional showers per week after Brown's surgery rather than the daily showers recommended by Dr. Slavin. (3d Am. Compl. ¶¶ 20; 47.) The record does not support Brown's contention that Dr. Slavin ordered daily showers immediately after the surgery. That recommendation only appears once Brown receives his follow-up appointment on February 25, 2013. (Neurosurgery Note at 2, Ex. 28 to Pl.'s Resp. to IDOC SOF [168-29].) Moreover, even if Dr. Obaisi was departing from a specialist's recommendation, a reasonable jury could not find that ordering only three showers a week, rather than daily showers, was deliberate indifference to Brown's needs considering the totality of the post-surgical treatment plan. *See Petties*, 836 F.3d at 728.

Dr. Slavin testified at his deposition that the additional showers were intended to keep Brown's neck muscles relaxed after surgery (Slavin Dep. 37:11–14), and Brown stated that the hot water helped with his sore back. (Pl.'s Dep. 213:20–214:5.) Taking those statements as true, it is still impossible to conclude that the totality of Brown's post-operative treatment plan reflects Obaisi's deliberated indifference to his needs. Immediately after surgery, Dr. Obaisi ordered that Brown receive Motrin and Norco, three additional showers per week, a low bunk permit, a neck brace, a permit for a crutch, and two medications to prevent harmful blood clots. (Pl.'s Resp. to Wexford SOF ¶ 25.) Though Obaisi does not explain why he did not order daily showers, even after Dr. Slavin recommended them in February 2013, Brown has not shown that this constituted deliberate indifference in the context of this full treatment plan. The fact that Dr. Slavin, examining Brown eight months after surgery, felt that things were "proceeding as expected" (Slavin Dep. 37:23–24), confirms that Brown was not significantly harmed. "[M]ere disagreement with a doctor's medical judgment" is not enough to support an Eighth Amendment violation. *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Summary judgment is granted to Dr. Obaisi on his failure to order daily showers.

### B. Follow-up Appointment

Next, Brown alleges that Dr. Obaisi was deliberately indifferent to his medical needs by failing to schedule a follow-up appointment for eight months after his surgery. The medical need for post-operative care is not disputed by the parties. Dr. Slavin ordered a follow-up appointment within two weeks of the July 11, 2012 surgery (Slavin Dep. 34:8–11), and this recommendation plainly was not met. The appointment did not occur until February 2013.

The question is whether this delay in treatment amounted to deliberate indifference by exacerbating Brown's injury or prolonging his pain. The reason for the appointment was primarily to check the surgical incision to ensure that it was healing properly. (Slavin Dep. 34:12–17.) Brown did receive medical care at the prison, however, and Slavin found—once

28

Brown received the appointment—that Brown's incision was completely healed. (Neurosurgery Note at 1.) Therefore, there is no evidence that Brown was subjected to pain or an exacerbated injury related to the surgical incision.

Brown further argues, however, that the follow-up was necessary before he could start physical therapy. (Pl.'s Resp. to Wexford SOF ¶ 26(h).) Brown testified at his deposition that he was in pain, and that he could not attend physical therapy without the surgeon's recommendation. (Pl.'s Dep. 78:15–21.) When he finally received his follow-up appointment, Brown reported to Dr. Slavin that his strength had not recovered to normal and that he had some pain in his neck, particularly after vigorous exercise which could cause pain for two or three days. (Slavin Dep. 35:20–36:5.) Slavin ordered physical therapy, evidently in the belief that it would help Brown. (*Id.* at 36:8–36:14.) After Slavin's recommendation, Brown did receive physical therapy. (Pl.'s Dep. 130:14–131:21.) There is a dispute of fact as to whether Brown was harmed by the delay in receiving Slavin's recommendation for physical therapy, which must be presented to the jury.

The Wexford Defendants argue that the delay in scheduling the follow-up appointment was caused by Nurse Maikaitis. Even if the initial rescheduling was caused by Nurse Maikaitis, however, a triable issue of fact exists as to whether Dr. Obaisi was aware that Brown needed another appointment and failed to reschedule it. Again, the medical director at Stateville is responsible for providing a timely and efficient response to inmates' health care needs. (Ghosh Dep. 14:24–15:5.) A reasonable jury could infer that Dr. Obaisi, as the medical director, was aware of Brown's need for a follow-up appointment. *See Farmer*, 511 U.S. at 842.

The Wexford Defendants further contend that the fact that Brown eventually did receive his follow-up appointment defeats his deliberate indifference claim on this score. (Wexford Br. 6.) That is simply not the rule. A delay in treatment can constitute a claim for deliberate indifference, as much binding authority makes clear. *See, e.g. Petties*, 836 F.3d at 730

(collecting ten Seventh Circuit cases); *id.* at 730 ("evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest"). The fact that treatment eventually occurs does not vitiate the claim.

## C. Retaliation

Finally, the court turns to Brown's retaliation claim against Dr. Obaisi. The retaliation claim against Dr. Obaisi is stated as a First Amendment retaliation claim (3d Am. Compl. ¶¶ 58–62), and as deliberate indifference to his medical need for a crutch. (*Id.* at ¶¶ 63–65.)

To prevail on a First Amendment retaliation claim, Brown must demonstrate that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)) (internal quotation marks omitted). The right to pursue actions in the courts is protected by the First Amendment, *see Eichwedel v. Chandler*, 696 F.3d 660, 673 (7th Cir. 2012), so the court considers only the second and third prongs.

There is a genuine issue of material fact concerning the retaliation claim. For the second prong, Brown states that depriving him of the crutch substantially interfered with his mobility. (Pl.'s Resp. to Wexford SOF ¶¶ 30(p).) The alleged consequences are severe, including missed medical appointments, lab tests, attorney appointments, and being unable to get to the cafeteria. (*Id.* at ¶¶ 30(p)–(bb).) Dr. Obaisi was inconsistent on the reason for terminating the permit, first stating that he did it because he repeatedly saw Brown walking without a crutch (Obaisi Jun. 1, 2015 Dep. 97:6–99:4; 100:18–23), but later acknowledging that he never personally saw Brown walking unassisted. (Obaisi Jul. 15, 2015 Dep. 77:9–11.) There is a genuine dispute concerning the extent of Brown's deprivation, and whether that deprivation would deter First Amendment activity.

There is also an issue of fact as to whether Obaisi had a retaliatory motive. Prior to filing the lawsuit, Brown's permit for a crutch was routinely renewed—including by Dr. Obaisi. (Pl.'s Resp. to Wexford SOF ¶¶ 28; 30(d).) On February 26, 2015, two days after filing his answer in this case, Dr. Obaisi terminated the permit. (Pl.'s Resp. to Wexford SOF ¶ 30(e).) Again, Dr. Obaisi was inconsistent on the reason for terminating the permit. Brown, for his part, asserts that Dr. Obaisi simply told him that he did not want Brown to have the crutch anymore. (Pl.'s Resp. to Wexford SOF ¶ 30(f).) Whether Dr. Obaisi's motive was retaliatory is a matter for the jury. Accordingly, summary judgment on Brown's retaliation claim is denied.

Brown also claims that Dr. Obaisi was deliberately indifferent to his need for a crutch. Dr. Obaisi evidently did not believe that Mr. Brown had a medical need for a crutch, while Brown states that the consequences of losing it were severe—he could barely get out of his cell. There is an issue of material fact as to whether Brown needed the crutch to manage his genuine mobility problems and if so, whether Dr. Obaisi was subjectively indifferent to that need. Summary judgment is denied as to Dr. Obaisi's deliberate indifference to Brown's need for a crutch.

## VII.    Nurse Madonna Maikaitis

Nurse Maikaitis prevented Brown from leaving Stateville for his post-operative follow-up appointment on August 17, 2012 due to the lift in his shoe, characterized by the Wexford Defendants as a "mix-up." (Wexford SOF ¶ 26.) This perplexing decision led to Brown's appointment not being rescheduled for nearly eight months. (Pl.'s Resp. to Wexford SOF ¶ 26(g).) Other than the bald assertion, unsupported by any citation to the record, that Nurse Maikaitis purposefully interfered with Brown getting to his appointment (*id.* at ¶ 3(1)), Brown has not produced any reason to find that this was more than merely negligent. She is not meaningfully discussed in Brown's deposition, and she herself testified that she did not remember the interaction. (Dep. of Madonna Maikaitis, Ex. H to Wexford SOF [150-8], at 34:9–

24.)  The level of intention required for deliberate indifference is higher than negligence, and a jury would have no basis to find that she was reckless or purposeful in interfering with Brown's medical care.

Defendants offer no explanation why an inmate should have his doctor's appointment cancelled because he has attempted to leave the facility with an unapproved medical device. Particularly where the medical device could so easily be left behind, as in this case, it is confounding that the sanction for this perceived rule violation was that Brown should not be allowed to see his surgeon for a follow-up appointment.  That said, there is no evidence that Nurse Maikaitis was responsible for this policy.  Summary judgment is granted as to Nurse Maikaitis.

## VIII.    Royce Brown-Reed

Royce Brown-Reed was the Health Care Unit administrator for the relevant time period. (Pl.'s Resp. to IDOC SOF ¶ 38(a).)  As the administrator, she was responsible for investigating inmate grievances related to health care (Brown-Reed Dep. 23:22–24:5), and making health care staff aware of what permits inmates had.  (*Id.* at 22:9–20.)  She did not review medical permits or ensure that they were enforced.  (*Id.* at 44:8–12.)  Brown claims that she should have investigated and remedied multiple grievances that he filed.  (3d Am. Compl. ¶ 49.)  Particularly, Brown claims that Brown-Reed ignored the following:

• A February 2013 grievance he filed when a corrections officer ordered him out of a medical shower.  (3d Am. Compl. ¶ 19.)

• Grievances related to Brown's missing neck brace.  (Pl.'s Br. Opp. to IDOC at 13; *e.g.*, Offender's Grievance #4155, Nov. 8, 2011 (finding that grievance is duplicate)).

• Grievances related to the "watch take" administration of the eye drops (e.g., Offender's Grievance # 617, Dec. 19, 2011 (duplicate)), as well as a conversation with Brown-Reed related to the eye drops.  (Pl.'s Resp. to IDOC SOF ¶ 46.)

The court presumes, for the purposes of summary judgment, that the original grievances underlying the duplicates that were provided to the court were sent to the health care unit that Brown-Reed supervised.

There is no *respondeat superior* liability under 42 U.S.C. § 1983. *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002). A recipient of a grievance, therefore, must independently meet the elements of a deliberate indifference claim in order to be liable for a constitutional violation, *see Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016); that is, the recipient must know of and disregard a substantial risk to inmate health. Accordingly, there is no liability for failing to intervene in situations that do not themselves present a substantial risk to inmate health. *See Perkins*, 312 F.3d at 875–76.

Several of these grievances arise from underlying situations that did not themselves substantiate a claim for deliberate indifference. Brown-Reed's failure to address them is not deliberate indifference. First, given the totality of care provided to Brown, there is not enough evidence in the record to demonstrate that each medical shower was necessary to avert a substantial risk of harm to Brown. *Supra* pp. 27–28. Therefore, she was not deliberately indifferent to Brown's need for medical showers. Second, as discussed earlier, failure to administer the eye drops according to a "watch take" order was not deliberately indifferent to Brown's medical needs related to his eyes. *Supra* pp. 25–27. Because the nurses were not deliberately indifferent in offering the eye drops to Brown, failing to respond to a grievance on that issue cannot be deliberately indifferent.

Brown's being deprived of the neck brace for many months, however, may have posed a substantial risk of pain, and Brown-Reed has not foreclosed the possibility that she was aware of the deprivation. Though the record shows only the duplicate grievance concerning Brown's neck brace, a factfinder could be persuaded that the original appropriately made its way to the health care unit, where it was ignored. Failure to respond to a well-founded grievance can

constitute deliberate indifference. *Diggs v. Ghosh*, No. 16-1175, ___ F.3d ___, 2017 WL 957201, at *5 (7th Cir. Mar. 13, 2017).

Brown-Reed also claims that she is entitled to qualified immunity on this claim. Qualified immunity shields government officials from liability where "their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In assessing the qualified immunity defense, courts consider (1) whether the conduct complained of violates the Constitution; and (2) whether the right was clearly established at the time the conduct occurred. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "A clearly established right is one that 'is sufficiently clear that any reasonable official would understand that his or her actions violate that right, meaning that existing precedent must have placed the statutory or constitutional question beyond debate.'" *Werner v. Wall*, 836 F.3d 751, 762 (7th Cir. 2016) (quoting *Zimmerman v. Doran*, 807 F.3d 178, 182 (7th Cir. 2015)). There is a dispute of fact as to whether Brown's rights were violated by Brown-Reed's failure to respond to his grievances regarding the brace. Furthermore, the right to necessary, pain-relieving measures—even if they are not curative—is clearly established. *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (two-month denial of anti-acid prescription to acid reflux sufferer sufficient to survive summary judgment); *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (reversing dismissal for defendants, finding denial of pain medication after surgery could constitute deliberate indifference, and denying qualified immunity). Brown-Reed is not entitled to qualified immunity on these facts. Because there is a triable issue of fact as to whether depriving Brown of the neck brace posed a substantial risk of harm and caused him pain, and whether Brown-Reed was indifferent to that deprivation, summary judgment is denied.

## IX. Marcus Hardy

Brown alleges that he filed many emergency grievances that were ignored by Marcus Hardy, Stateville's warden until December 2012. (Pl.'s Resp. to IDOC SOF ¶ 5.) Particularly, Hardy ignored all of the grievances that Brown filed regarding his missing neck brace. (*Id.* at ¶¶ 18(a)–(g).) He also allegedly failed to act after Brown spoke with him personally about the missing neck brace and sent him a letter. (*Id.* at ¶ 18(h).) Finally, Brown says that he spoke with Hardy about the number of showers he was receiving, but that issue was not resolved. (*Id.* at ¶ 23.)

Hardy claims that he did not personally review these grievances. (IDOC SOF ¶ 21.) A grievance that comes back to an inmate signed "Marcus Hardy," however, will create a triable issue of fact as to whether Marcus Hardy was aware of the subject of that grievance. *Gray*, 826 F.3d at 1008. Because Brown filed several grievances directed to Hardy regarding the brace, and testified that he spoke with Hardy personally, there is sufficient evidence to survive summary judgment that Hardy knew of Brown's complaint. *See Diggs*, 2017 WL 957201, at *5. Hardy is not entitled to qualified immunity for the same reasons that Brown-Reed is not; Brown's right to receive necessary, pain-relieving measures is well-established. *See Walker*, 293 F.3d at 1040. Because Brown has identified an issue of material fact as to whether the brace was such a measure, summary judgment must be denied.

As to Brown's claim regarding the showers, summary judgment is granted. The prison staff's denial of additional showers did not violate the Eighth Amendment, and Hardy's failure to respond to complaints about that issue cannot substantiate a violation, either.

## CONCLUSION

For the foregoing reasons, the Wexford Defendants' motion for summary judgment [151] is granted in part and denied in part: Summary judgment is granted as to Nurses Dybas, Garcia, Harper, Mikaitis and Utke, and granted to Dr. Obaisi and Dr. Carter on Count II.

Summary judgment is denied on Counts I, III and IV of the complaint as to Dr. Obaisi, and denied on Count I of the complaint as to Dr. Carter.

The IDOC Defendants' motion for summary judgment [153] is granted in part and denied in part. Summary judgment is granted as to Shawnel Grubbs. Summary judgment on Count I is denied as to Marcus Hardy and Royce Brown-Reed.

A status hearing is set for April 12, 2017, at 9:00 a.m. The parties are urged to discuss the possibility of settling the case.

ENTER:

Dated: March 29, 2017

_____
REBECCA R. PALLMEYER
United States District Judge